IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DASCO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-1424-JLH-CJB |
| | ) | |
| OLD WORLD INDUSTRIES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

In this civil action relating to a contract dispute, presently pending before the Court is Defendant Old World Industries, LLC's ("Defendant") motion to dismiss the Complaint against it, (the "Motion"), (D.I. 9), which was filed pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff DASCO, Inc. ("Plaintiff") opposes the Motion. For the reasons set forth below, the Court recommends that the Motion be GRANTED-IN-PART and DENIED-IN-PART.

I.  **BACKGROUND**

   A.  **Factual Background**

The Motion has been pending for some time prior to its referral to the Court, and the parties thus seek its prompt resolution. For that reason, and because the parties are well versed in the relevant facts, the Court will avoid a lengthy factual recitation here.

The Motion relates to an Agreement between the parties (and Plaintiff's sole stockholder, a non-party) entered into on October 28, 2019 (hereinafter, the "Agreement"); pursuant to the Agreement, Defendant acquired Plaintiff's bulk diesel exhaust fluids and automotive grade urea business (the "Bulk DEF Business"). (D.I. 1 at ¶¶ 1-3)  Defendant paid $6 million for the Bulk DEF Business at closing, but the Agreement also provided that Defendant might have to pay up to $5 million more in "earn-out" payments over the next three years, depending on the amount of

profits the Bulk DEF Business earned during those years. (*Id*. at ¶¶ 3, 13-14) The parties have disputes about how to interpret the Agreement with regard to its earn-out payment provisions, and about whether the Agreement was otherwise breached by Defendant. Those disputes have given rise to the instant case.

Additional facts relevant to resolution of the instant Motion will be discussed in Section III.

### B. Procedural Background

Plaintiff filed its Complaint on October 27, 2022. (D.I. 1) The instant Motion was filed on January 3, 2023. (D.I. 9) Briefing on the Motion concluded on February 17, 2023. (D.I. 14) The case was reassigned to United States District Judge Jennifer L. Hall on January 8, 2024, and Judge Hall referred this case to the Court on January 25, 2024 to resolve all pre-trial matters up to the Pretrial Conference. (D.I. 16) At Plaintiff's request, (D.I. 15), the Court held oral argument on the Motion on April 30, 2024.

## II. STANDARD OF REVIEW

The two-step standard for review of a Rule 12(b)(6) motion like this one is well-settled, and was set out in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The Court incorporates that standard herein and will follow it in resolving the Motion. In doing so, the Court will consider not only the content of the Complaint's allegations, but also that of any documents referenced therein or integral thereto (a few of which are cited below). *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

## III. DISCUSSION

There are three Counts in the Complaint: (1) Count One, wherein Plaintiff seeks a declaratory judgment that the Agreement provides for earn-out payments to be made in a form

and manner that matches Plaintiff's (disputed) view of what the relevant text means; (2) Count Two, in which Plaintiff alleges that Defendant breached Section 1.06(q) of the Agreement; and (3) Count 3, in which Plaintiff alleges that Defendant breached the implied covenant of good faith and fair dealing (hereinafter, the "covenant"). (D.I. 1 at ¶¶ 30-53)[1] Defendant moves to dismiss all three counts, and the Court will address each count in turn below.

### A. Count One

In Count One, Plaintiff seeks a declaratory judgment pursuant to the federal Declaratory Judgment Act, 28 U.S.C. § 2201(a), to the effect that "the milestones expressly agreed to in the Agreement govern." (D.I. 1 at ¶¶ 38, 53)[2] Essentially, the parties have a dispute about the meaning of the earn-out provisions referenced in Section 1.06 of the Agreement, and Plaintiff is seeking a Court order that says that its view of the Agreement's meaning is the correct one. The relevant portions of Section 1.06 read as follows:

> (e) "Spread" shall mean the difference between the amount of Three Million Two Hundred Thousand Dollars ($3,200,000) (the "Target Amount") and $1,648,435.65, representing the amount of Seller's [i.e., Plaintiff's] Gross Margin as of the Closing.
>
> (f) Beginning twelve (12) months following the Closing, Seller shall receive an amount equal to twenty percent (20%) of the Earn-Out Payment ($1,000,000 each) upon Buyer's [i.e., Defendant's] achievement of any of the following five (5) Earn-Out Payment milestones during the Earn-Out Period:
>
>> (i) Earn-Out Margin, on a trailing twelve months basis, equal to or exceeding fifty percent (50%) of the Spread ($775,782.18);

---

[1] The parties agree that Delaware law applies to the substantive legal issues discussed herein regarding Counts One, Two and Three. (D.I. 1; D.I. 10 at 8)

[2] The Complaint actually says that it seeks a declaratory judgment pursuant to 10 Del. Code tit. 10, §§ 6501-02, but everyone agrees that that was a mistake, and that the federal Declaratory Judgment Act controls here. (D.I. 1 at ¶ 31; D.I. 10 at 8 n.2; D.I. 13 at 13 n.4)

3

>>(ii)    Earn-Out Margin, on a trailing twelve months basis, equal to or exceeding sixty-two and one-half percent (62.5%) of the Spread ($969,727.72);
>
>>(iii)    Earn-Out Margin, on a trailing twelve months basis, equal to or exceeding seventy five[-]percent (75%) of the Spread ($1,163,673.26);
>
>>(iv)    Earn-Out Margin, on a trailing twelve months basis[,] equal [to] or exceeding eighty-seven and one-half percent (87.5%) of the Spread ($1,357,618.81); and
>
>>(v)    Earn-Out Margin, on a trailing twelve months basis, equal [to] or exceeding one-hundred percent (100%) of the Spread[.]

(D.I. 10, ex. A at § 1.06(f))

Plaintiff's view is that Sections 1.06(e)-(f) mean that it was entitled to obtain each of the earn-out payments at issue when, in a relevant 12-month period, the Bulk DEF Business had an Earn-Out Margin that amounted to the requisite percentage (i.e., 50%, 62.5% and so on) of the "Spread" (that is, of $1,551,564.35—the amount of money that you get when you subtract the Target Amount of $3,200,000 from $1,648,435.65, which is the amount representing Plaintiff's Gross Margin as of the Closing).  (D.I. 13 at 14)  In contrast, Defendant's view is that Sections 1.06(e)-(f) mean that Plaintiff was entitled to obtain each of the earn-out payments at issue when, in a relevant 12-month period, the Bulk DEF Business had an Earn-Out Margin that amounted to the requisite percentage (i.e., 50%, 62.5% and so on) of the Spread *added to* $1,648,435.65, i.e., Plaintiff's Gross Margin as of the Closing.  (D.I. 10 at 10, 12)  To use a concrete example, Plaintiff thinks that the first earn-out payment should have been due when, in the relevant time period, the Bulk DEF Business had an Earn-Out Margin of at least $775,782.18.  Defendant thinks that the payment should only have been due when, in that period, the Bulk DEF Business

4

had an Earn-Out Margin of at least $2,424,217.83 (i.e., the Gross Margin as of the Closing *plus* $775,782.18).

Pursuant to Delaware law, the Court must first determine, as a legal matter, whether the contract terms at issue are ambiguous.[3] If a contract's language is "unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of a contract, or to create an ambiguity." *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017). And here, were the contract to unambiguously read in the manner Defendant suggests, then Count One would need to be dismissed.

Defendant certainly makes some strong points as to why the intrinsic evidence supports its position. Among those that resonated most clearly with the Court are that:

- Plaintiff's view does not appear to give real meaning to the term "Target Amount" as used in Section 1.06(e). Defendant's position is that in the Agreement, the parties were trying to account for the fact that if the Bulk DEF Business increased its Earn-Out Margin beyond what Plaintiff's Gross Margin was at closing (i.e., if the business did much better after closing than it did before closing), then Plaintiff would get paid more money for the sale of that business. (D.I. 10 at 11, 14) Defendant says that any reasonable understanding of the word "target" is something akin to "a goal to be achieved"—and that the parties picked a $3.2 million Earn-Out Margin as a "target" or "goal" here, one that if reached during a 12-month period would entitle Plaintiff to the entire $5 million in earn-out payments that it could possibly earn. (*Id.* at 11 (internal quotation marks and citation omitted)) Defendant argues that Plaintiff's view of the Agreement's meaning does not really render the $3.2 million figure a true "target" in any respect. (*Id.* at 10-11 (noting instead that Plaintiff treats "the 'Spread' as if it defined the earn-out's profit *target*" (emphasis in original); *see also* D.I. 14 at 1 (calling this the "clearest defect" in Plaintiff's argument)) And during oral argument, Plaintiff's counsel

---

[3] Ambiguity is present "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

5

could not well articulate a reason as to how its position gave real effect to the term "Target Amount."

- It seems strange that the parties would have picked the top end of the Spread (i.e., $1,551,564.35) as the precise point at which Plaintiff would be entitled to the entirety of the $5 million in earn-out monies. Why would the parties choose that specific dollar amount as the anchor upon which to measure Plaintiff's entitlement to each of the individual $1 million earn-out payments? The top end of the Spread seems like a pretty arbitrary endpoint to use for this purpose. After all, it is not as if it amounts to an easily-identifiable round number, or an understandable, set percentage of the Gross Margin as of the Closing. Instead, it is a decidedly odd number—one whose only relevance seems to be that it is the amount of the difference between the Gross Margin as of the Closing and the $3.2 million "Target Amount." Why would the parties pick that seemingly arbitrary number as the high point of what Plaintiff could earn in earn-out money?

- Defendant argues that Plaintiff's position could be seen as leading to an "absurd result": i.e., that if the Bulk DEF Business did *worse* in a relevant period after Defendant took it over, as compared to its performance as of the closing date, then Defendant will have to pay Plaintiff *more money* regarding the sale of that business. (D.I. 10 at 14 (citing *Manti Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199, 1208 (Del. 2021) ("An interpretation is unreasonable if it produces an absurd result or a result that no reasonable person would have accepted when entering the contract.") (internal quotation marks and citation omitted)); *see also* D.I. 14 at 4) If you believe that the parties to the Agreement would have considered allowing Plaintiff to collect more than the initial $6 million payment only if the performance of the Bulk DEF Business *actually improved* after that time, then Plaintiff's reading of the Agreement would seem to lead to a nonsensical result. That is because all of the $1 million earn-out payments it would be entitled to under its reading occur if the Bulk DEF Business has an Earn-Out Margin of *less* than the Gross Margin as of the Closing.

In light of these above-referenced good arguments, if Plaintiff could not point to any part of the intrinsic evidence that supported its viewpoint, then the matter would surely be decided. But Plaintiff is not without at least some ammunition here.

6

To that end, Plaintiff notes that a literal reading of Section 1.06(f) supports its argument, not Defendant's position. That is because Section 1.06(f) states facially that Plaintiff will be entitled to receive up to 20% of the Earn-Out Payment (i.e., $1 million) upon Defendant's "achievement of any of the following five (5) Earn-Out Payment milestones during the Earn-Out Period"—and it then defines such milestones as when "Earn-Out Margin, on a trailing twelve months basis, [is] equal to or exceeding [a particular percentage] *of the Spread*[.]" (D.I. 10, ex. A at § 1.06(f) (emphasis added)) And Section 1.06 makes clear that the "Spread" is "the difference between . . . $3,200,000 [i.e., the Target Amount] . . . and $1,648,435.65, [i.e., Plaintiff's Gross Margin as of the Closing]"—i.e., an amount equaling $1,551,564.35. (*Id*. at § 1.06(e)) That the "Spread" is meant to refer to this $1,551,564.35 figure seems to be reinforced by Section 1.06(f), as there the Agreement, using parentheticals, states exactly how much money a certain listed percentage of the Spread actually amounts to. For example, Section 1.06(f) notes that "fifty percent (50%) of the Spread" is "($775,782.18)[.]" (*Id.*, ex. A at § 1.06(f)(i)) And so, read quite literally, Section 1.06(f) seems to be saying that each earn-out payment amounts to a set percentage of $1,551,564.35 (e.g., if Defendant achieves an Earn-Out Margin of $775,782.18 in a relevant period, it is entitled to the first additional $1 million earn-out payment). (D.I. 13 at 14-17) Defendant's position, in contrast, seems to be that what Section 1.06(f) *really meant to say* is not that each earn-out payment is due when the Earn-Out Margin is "equal to or exceeding [a particular percentage] *of the Spread*"—but instead that each payment is due when the relevant Earn-Out Margin is "equal to or exceeding *Plaintiff's Gross Margin at Closing plus* [a particular percentage] *of the Spread*." (*See* D.I. 10 at 12; D.I. 13 at 15) But the parties didn't write the Agreement in the latter way. They wrote it in the former way.

Additionally, Plaintiff has at least some explanation for why it might make sense that earn-out payments would be achieved even if the relevant Earn-Out Margin was something *less* than Plaintiff's Gross Margin at Closing. It says that the parties' focus in drafting the Agreement was on "maintaining profits" in the Bulk DEF Business going forward—and not necessarily on "growing profits[.]" (D.I. 13 at 13-14) The Court supposes that this *could* be so. There are, after all, a few references in the Complaint to Plaintiff's expectation that Defendant would "maintain" Plaintiff's former client relationships. (*See, e.g.*, D.I. 1 at ¶¶ 24, 44) And the Complaint certainly does not plead that this was *not* the parties' intent.

In the end, the intrinsic evidence points in different directions. Certain portions of Section 1.06(e) (particularly its use of the phrase "Target Amount"), and the reasonable inferences to be drawn therefrom, strongly indicate that Defendant's position is the correct one. But the wording of Section 1.06(f), in contrast, provides some support for Plaintiff's view. Though Defendant's position seems more compelling, in this circumstance, the Court cannot say that Plaintiff's reading is entirely unreasonable. Thus, the Court must conclude that the Agreement is ambiguous on this score.

When contractual provisions are ambiguous, courts may look to extrinsic evidence to help discern the parties' intent. *Sun-Times Media Grp., Inc. v. Black*, 954 A.2d 380, 389 (Del. Ch. 2008). When the Court does so here,[4] the cited extrinsic evidence actually seems to help the Plaintiff's case more than it hurts it. This is so in two significant ways:

- Prior to signing the Agreement, the parties entered into a letter of intent ("LOI") in August 2019. The content of the LOI is clearly in line with Defendant's view of how earn-out payments should be calculated. (D.I. 14 at 5-6) For example,

---

[4] The extrinsic evidence cited below was referenced in and is integral to the Complaint, so the Court can take it into account in assessing this Rule 12(b)(6) motion. (*See* D.I. 1 at ¶¶ 18, 36)

8

  the LOI states that the $5 million in possible earn-out payments will be paid to Plaintiff "if the DEF Assets generate $3.2 million in gross margin" in a 12-month period. (D.I. 13, ex. 1 at 5) And the LOI lists out the amounts of Gross Margin that would trigger earn-out payments by specifically referencing amounts that are far higher than the highest point of the Spread. (*See id*. at 6 (noting that the first earn-out payment would be due when the Gross Margin reached "$2,100,000")) However, the problem for Defendant is that this language *did not make it into the final Agreement*. And in the Complaint, Plaintiff affirmatively pleads that the reason why this is so is that between the signing of the LOI and the signing of the Agreement, the parties had a change of heart; Plaintiff asserts that in this period, the parties "agreed to . . . lower milestones [than were referenced in the LOI] . . . and explicitly wrote those lower milestones in the Agreement." (D.I. 1 at ¶ 33; *see also* D.I. 13 at 18) Plaintiff even alleges that during "tense negotiations" in October 2019, Defendant's former General Manager of Diesel Exhaust Fluid specifically "agreed" to write the Agreement in a manner reflecting Plaintiff's interpretation of how earn-out bonuses were to be paid out. (D.I. 1 at ¶¶ 24, 33) In light of these allegations, which the Court has to take as true at this stage of the case, the fact that language helpful to Defendant's position in the LOI did not make it into the final version of the Agreement bolsters Plaintiff's case (at least for now).

- Plaintiff points to a spreadsheet sent by Defendant's Director of Financial Planning and Analysis in July 2021. (D.I. 1 at ¶ 36; D.I. 13 at 19 & ex. 5) It is undisputed that in this spreadsheet, Defendant's representative includes a list of "Earnout Hurdles" that align with Plaintiff's view of what Sections 1.06 means—i.e., hurdles that track referenced percentages "of the Spread" itself, not percentages of the Spread when added onto Plaintiff's Gross Margin as of the Closing. (D.I. 13 at 19 & ex. 5) In its briefing, Defendant says that this spreadsheet is misleading, in that therein, all its representative was doing "show[ing] that [Plaintiff] would not be entitled to an earn-out *even if* [Plaintiff's] erroneous interpretation were adopted." (D.I. 14 at 7 (emphasis in original)) That may be so. But figuring out if Defendant is correct on that score is what discovery is for.

  Again, based on the record before it, Defendant's position here seems the more reasonable one to the Court. Put differently, if the Court had to predict how things will shake out

based only on what it knows now, it would be a bit surprised if Plaintiff ultimately prevails as to Count One. But at the pleading stage, when taking into account the intrinsic and extrinsic evidence at hand, the Court cannot say Plaintiff's position is *un*reasonable. And at this phase of the case, the Court "must not choose between reasonable interpretations of ambiguous contract provisions when considering a motion to dismiss[.]" *Kahn v. Portnoy*, Civil Action No. 3515-CC, 2008 WL 5197164, at *3 (Del. Ch. Dec. 11, 2008); *see also Cybrary, Inc. v. Learningwise Educ. Inc.*, Civil Action No. 22-500-CFC, 2023 WL 1778614, at *5 (D. Del. Feb. 6, 2023). Therefore, the Court recommends that the Motion be denied as to Count One. *See Zweigenhaft v. PharMerica Corp.*, Civil Action No. 19-2201-RGA, 2020 WL 5258345, at *1 (D. Del. Sept. 3, 2020) ("Dismissal, pursuant to Rule 12(b)(6), is proper only if the defendants' interpretation is the only reasonable construction as a matter of law.") (internal quotation marks and citation omitted).

### B. Count Two

With Count Two, Plaintiff alleges that Defendant has breached[5] the portion of Section 1.06(q) of the Agreement stating that "[d]uring the Earnout Period, [Defendant] agrees to conduct the DEF Business . . . in a manner generally consistent with the efforts and resources [Defendant] devotes to its other operations and businesses similarly situated[.]" (D.I. 10, ex. A at § 1.06(q); *see also* D.I. 1 at ¶ 42; D.I. 10 at 16; D.I. 13 at 8-9; D.I. 14 at 7) Plaintiff says that Defendant has breached this provision in light of various ways that it mismanaged the Bulk DEF Business post-closing. (D.I. 13 at 8; *see also* D.I. 1 at ¶ 44)

---

[5] Pursuant to Delaware law, a plaintiff states a claim for breach of contract by plausibly alleging the following elements: (1) the existence of a contract, whether express or implied; (2) the breach of an obligation imposed by that contract; and (3) resultant damages to the plaintiff. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009). Only the second element is at issue here. (D.I. 13 at 7-8)

The difficulty for Plaintiff is that it never really pleads facts plausibly indicating: (1) what is the other "operation[] and business[]" that Defendant was operating in a manner that was "[in]consistent" with the "efforts and resources" it utilized as to the Bulk DEF Business; or (2) why any such identified other business was "similarly situated" to the Bulk DEF Business. Section 1.06(q)'s text requires that some articulable facts be pleaded on these points, in order to allow the reasonable inference that this contract provision was breached.[6] (D.I. 10 at 17) Yet none are actually set out in the Complaint.

At oral argument and in its briefing, Plaintiff's counsel cited to only one other business that Plaintiff meant to reference as a comparator in this regard: Defendant's "antifreeze" division. (D.I. 13 at 10) And it is true that the Complaint references that division in two of its paragraphs. (D.I. 1 at ¶¶ 25, 43) But aside from a vague and conclusory assertion that the antifreeze division "is an industry leader[,]" (*id*. at ¶ 43), the Complaint never really explains why or how Defendant used "efforts and resources" with regard to *that* division in a manner that differed from the type of "efforts and resources" it devoted to the Bulk DEF Business.[7] Nor does

---

[6] *Cf. Neurvana Med., LLC v. Balt USA, LLC*, C.A. No. 2019-0034-KSJM, 2020 WL 949917, at *16-17 (Del. Ch. Feb. 27, 2020) (granting a motion to dismiss a breach of contract claim as to a provision requiring the defendant to use "efforts and resources comparable to those which an entity in the [same] industry of similar resources and expertise . . . generally use . . . to accomplish such activities and objectives in an expeditious manner for its own products . . . of similar market potential at a similar stage in development or product life[,]" in that the complaint "does not identify a single 'entity in the medical device industry of similar resources and expertise as' [the defendant]" or "any 'products . . . of similar market potential at a similar stage in development or product life'" as the one at issue) (internal quotation marks and citations omitted); *Tendyne Holdings, Inc. Securityholders' Representative Comm. on Behalf of the Tendyne Holdings, Inc. Securityholders*, Civil Action No. 18-1070-CFC, 2019 WL 2717857, at *3 (D. Del. June 28, 2019).

[7] To take just one example, Plaintiff alleges that one of the forms of mismanagement Defendant engaged in as to the Bulk DEF Business is that it "failed to maintain two major truck stop customers" after the closing. (D.I. 1 at ¶ 44) The Complaint is silent, however, as to whether the antifreeze division also lost major customers in this time period, or

11

the Complaint allege any facts about why the antifreeze division is said to be "similarly situated" to the Bulk DEF Business.[8] That is not proper notice of a breach of contract claim.[9] And so the Court recommends grant of the Motion as to Count Two.

That said, it seems possible that Plaintiff might be able to plead the missing facts in an amended complaint. In light of this, and because Federal Rule of Civil Procedure 15 states that leave to amend should be freely permitted "when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), the Court will recommend that dismissal of Count Two be without prejudice.

C.  **Count Three**

With regard to Count Three, Delaware law explains that the "implied covenant of good faith and fair dealing cannot be employed to impose new contract terms that could have been bargained for but were not[.]" *Oxbow Carbon & Minerals Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 503 (Del. 2019) (internal quotation marks and citation omitted); *see also Hindlin v. Gottwald*, C.A. No. 2019-0586-JRS, 2020 WL 4206570, at *6 (Del. Ch. July

---

whether the division retained its major customers; the pleading simply alleges no facts about this comparative situation at all.

[8]  Indeed, in one instance, the Complaint actually appears to suggest that the antifreeze division is *not* similarly situated to the Bulk DEF Business. In paragraph 25, the Complaint alleges that the antifreeze division is a business that "barely relies on making active sales[,]" while the Bulk DEF Business is heavily reliant on such active sales (so much so that Plaintiff offered to train Defendant's personnel in the Bulk DEF Business on how to market and sell its products). (D.I. 1 at ¶ 25)

[9]  Plaintiff also claims that it engaged in the requisite comparative analysis in paragraph 28 of the Complaint, where it alleges that in 2022, Defendant's management "made a presentation stating which [Defendant] businesses were to be emphasized" and also stated that the Bulk DEF Business "was to be *de*-emphasized." (D.I. 1 at ¶ 28 (emphasis in original) (*cited in* D.I. 13 at 9)) But paragraph 28 never identifies what other Defendant "businesses" it is talking about. And it certainly never pleads any facts suggesting why those (unnamed) businesses were "similarly situated" to the Bulk DEF Business. So this paragraph is of no help to Plaintiff's argument. (D.I. 14 at 8)

22, 2020).  Plaintiff's claim here is that when Defendant renegotiated its supply agreement in 2021 with Coffeyville Resources & Marketing, LLC ("Coffeyville"), wherein it reduced the duration of the Coffeyville contract, Defendant violated the covenant and harmed Plaintiff (in that the renegotiated contract all but "guaranteed" that Plaintiff would not be able to attain certain earn-out milestones).  (D.I. 1 at ¶ 52; *see also* D.I. 13 at 11)  But in its reply brief, Defendant persuasively argued that the alleged implied contract term—i.e., a term indicating that Defendant should not be able to renegotiate the Coffeyville agreement post-closing—is certainly something that Plaintiff "could have [] bargained for" when the Agreement was being drafted.  (D.I. 14 at 9)  To that end, Defendant pointed out that Section 1.11 of the Agreement explains how Defendant was permitted to come to a supply agreement with Coffeyville "on such terms and conditions as are deemed acceptable to [Defendant], in its sole discretion[.]"  (D.I. 10, ex. A at § 1.11)

Indeed, during oral argument, Plaintiff's counsel acknowledged the force of Defendant's argument here, and essentially agreed that there was no good reason why Count Three should not be dismissed.  In light of this, the Court recommends grant of the Motion as to Count Three, with prejudice.

### IV. CONCLUSION

For the reasons set forth above, the Court recommends that the Motion be GRANTED-IN-PART and DENIED-IN-PART.  More specifically, the Court recommends that the Motion be DENIED as to Count One, GRANTED without prejudice as to Count Two and GRANTED with prejudice as to Count Three.

To the extent that the Court's recommendations are adopted, it also recommends that:  (1) Plaintiff should be required to file an Amended Complaint that includes reference to the correct

13

statute relating to Count One, *see supra* n.2; and (2) to the extent Plaintiff wishes to attempt to re-plead Count Two, it be permitted to do so in such an Amended Complaint; and (3) that this new pleading must be filed by no later than 14 days after any order affirming this Report and Recommendation.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: May 6, 2024

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE